**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

JEFFREY POLEK,

       *Plaintiff*,

*v.*

GRAND RIVER NAVIGATION
COMPANY, INC.,

       *Defendant*.

_____/

CASE NO. 09-CV-13869

DISTRICT JUDGE THOMAS L. LUDINGTON
MAGISTRATE JUDGE CHARLES E. BINDER

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
**ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 24)

**I.      RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that Defendant's motion for

summary judgment be **DENIED.**

**II.     REPORT**

**A.      Introduction**

This retaliatory discharge case brought under the Seaman's Protection Act, 46 U.S.C. §

2114, commenced on September 30, 2009.  On July 29, 2010, Defendant Grand River Navigation

Company, Inc., (hereafter "Defendant" or "GRN") filed a motion for summary judgment.  By order

of U.S. District Judge Thomas L. Ludington, the motion was referred to the undersigned magistrate

judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1).  (Doc. 25.)  On August

27, 2010, Plaintiff filed a response to the motion (Doc. 28), and on September 17, 2010, Defendant

filed a reply. (Doc. 29.) A hearing was held on September 28, 2010, and the motion was taken under advisement. The motion is therefore ready for Report and Recommendation.

## B. Seaman's Protection Act

"Admiralty and maritime law includes a host of special rights, duties, rules, and procedures." *Lewis v. Lewis & Clark Marine, Inc*., 531 U.S. 438, 446, 121 S. Ct. 993, 148 L. Ed. 2d 931 (2001). The Seaman's Protection Act provides in relevant part that "[a] person may not discharge or in any manner discriminate against a seaman because the seaman in good faith has reported or is about to report to the Coast Guard or other appropriate Federal agency or department that the seaman believes that a violation of a maritime safety law or regulation prescribed under that law or regulation has occurred . . . ." 46 U.S.C. § 2114(a)(1)(A). The statute's goal is to guarantee that, "when seamen provide information of dangerous situations to the Coast Guard, they will be free from the 'debilitating threat of employment reprisals for publicly asserting company violations' of maritime statutes or regulations." *Gaffney v. Riverboat Services of Indiana, Inc*., 451 F.3d 424, 444 (7th Cir. 2006) (quoting *Passaic Valley Sewerage Comm'rs v. United States Dep't of Labor*, 992 F.2d 474, 478 (3d Cir. 1993)).

## C. Background

Many of the facts of this case are undisputed. Plaintiff was employed by Defendant as a 3rd Assistant Engineer aboard the M/V Manistee. (Polek Dep., Doc. 24, Ex. 2 at 5.) On September 6, 2009, while the vessel was docked, Plaintiff became aware of a leak in the starboard side bow of the vessel and reported it to the chief engineer, who stated that he already knew of the leak and that it was being taken care of. Plaintiff remained concerned about the leak and mentioned it again to Chief Engineer Peterson as the vessel was underway to Stoneport, Michigan.

Chief Peterson told Plaintiff that he "had taken pictures, sent the pictures to the office. The office said it was okay. Don't worry about it." (Pl.'s Dep., Doc. 28, Ex. A at 22.)

Late at night on September 9, 2009, Plaintiff sent an email to Richard Minnich of the Coast Guard's Toledo office, stating in part:

> On 9/6/09 the dock boss in St. Joe pointed out to the mate on watch . . . that as we were ballasting the vessel there was water streaming out of the outer hull of the vessel in the vicinity of #6 starboard ballast tank. Many crewmembers (including myself) have seen this leak. It appears to be about 4 feet above the water line when the vessel is in a ballasted condition, and I believe it is BELOW the water line when we are loaded with cargo.
>
> The chief engineer (Einar Peterson) took photos of the leak and reported the leak to John Hayes the port engineer. Photos of the leak were also sent via email to Mr. Hayes. Mr. Hayes reportedly told the Chief engineer "it (the leak) in his opinion did not appear to be a big deal and NOT to report it or make a big deal about it." I do not know the exact procedures/regulations regarding such findings but I think it merits at least an inspection to see if this "leak" needs repair, or if it is safe to keep sailing as is until the end of the season.

(Doc. 28 at Ex. A.) Plaintiff asked the Coast Guard officer not to reveal his name as he was still serving on the vessel. (*Id*.)

The following morning, September 10, 2009, Chief Peterson sent an email to Engineering Superintendent John Hayes, which stated in part the following:

> I have an issue with the crew.
>
> Jeff Polek is a VERY good and conscientious engineer. However I believe he is also a potential liability to the company.
>
> I went into the Control Room, and he began asking me about the "big crack" in the hull, and about our "slamming" into the bridge, and about going "up on the rocks," in St. Joe. I had already been told that he was heard on the phone telling someone about these things, as was one of the "new" crewmembers.
>
> * * * *
>
> I let him know that if, indeed, it had happened, and I was the least bit concerned, that I would have taken steps to ensure that the vessel was safe, and that I had no

intention, nor desire to go down with ANY ship. I also told him that people getting on the phone and telling others ashore such nonsense, would potentially put the vessel's (as well at their own) future usefulness in jeopardy. All it would take it for someone to "drop a dime" to the Coast Guard, and we would be tied up for an indefinite time while they investigated.

He is still not satisfied, and insists that his safety out here is paramount. Like I said, he's a good Engineer, but he really is a weenie at times. I believe the crews need to be informed and relate all such concerns to the captain and/or chief engineer, and to refrain from broadcasting anything which happens (or appears to happen) aboard the vessels, to avoid having the vessels taken out of service.

(Doc. 28 at Ex. C.)

Less than thirty minutes later, Hayes forwarded the email to Defendant's Vice President of Operations Ed Wiltse, Mark Rohn, and Personnel Manager Rick Turman, adding his own comment that he "did not feel that this was a safety issue as it appeared to be coming from the seam and was not a hull crack." (*Id.*) Within another thirty minutes, V.P. Ed Wiltse responded via email to Chief Peterson, stating in part that "John has arranged for Ken Siford to examine the Manistee at the earliest opportunity when the vessel gets down to Cleveland on Saturday," and that "Ken is our Company's expert with many years of experience in hull and ship structure issues and it will be him who will determine the proper action here – not the nonsensical ravings of an inexperienced junior engineer with almost no knowledge of such matters." (Wiltse email dated Sept. 10, 2009, at 10:30 am, Doc. 28 at Ex. C.) Wiltse went on to instruct Chief Peterson,

Please explain this to Mr. Polek and inform him that we do not intend on relying on his lack of experience in such matters to change our operating policies and, of course, if he still feels that he has a better grasp on ship structure than the Captain, Chief Engineer, Engineering Superintendent, and Vice President of Operations; that maybe he would feel more comfortable in another position elsewhere.

(*Id.*)

Later that day, at approximately 1500 hours, while the vessel was moored in Stoneport, officials from the Coast Guard's Sault St. Marie office contacted Captain Brezinski via telephone aboard the M/V Manistee and informed him that someone had reported that there was a hole or a crack in the hull. (Brezenski Dep. at 24-25, 30-31; Minnich Dep. at 28.)

At approximately 1600 hours, Chief Engineer Peterson approached Plaintiff on the deck and they had a conversation. The substance of that conversation is in dispute. Plaintiff asserts that he was fired; Defendant asserts that Plaintiff quit. In any event, Plaintiff departed the vessel shortly thereafter. Prior to his departure, Plaintiff informed the ship's captain that he had contacted the Coast Guard. Defendant states that later that evening the Coast Guard personnel came aboard the vessel and "identified a 2" - 4" fracture in the side shell, and required [Defendant] to make permanent repairs to the shell plating once the vessel arrived in a Lake Erie port in the next few days." (Doc. 24, Br. at 6.)

Defendant moves for summary judgment on Plaintiff's claim under 46 U.S.C. § 2114 on the grounds that (1) Plaintiff cannot prove that he was discharged (Doc. 24, Br. at 7-8); (2) the evidence fails to show that Defendant had knowledge that Plaintiff had called the Coast Guard (*id*. at 8-11); and (3) Plaintiff's report to the Coast Guard was not a good faith report of a violation of a maritime safety law or regulation because the leak was "minor." (*Id*. at 13.) Defendant also moves for summary judgment on Plaintiff's prayer for punitive damages, asserting that punitive damages are not appropriate in this case. (*Id*. at 15.)

### D.    Motion Standards

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, and will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts and

inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

The non-moving party has an obligation to respond to the motion and present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 191 L. Ed. 2d 202 (1986).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

### E.     Analysis & Conclusion

#### 1.     Adverse Employment Action

Defendant breaks down the Seaman's Protection Act into three elements and argues that it is entitled to summary judgment because the evidence is one-sided in its favor on each of the three elements.  Again, the Act provides that "[a] person may not [1] discharge or in any manner discriminate against a seaman [2] because the seaman in good faith has reported or is about to report to the Coast Guard . . . [3] that the seaman believes that a violation of a maritime safety law or regulation prescribed under that law or regulation has occurred . . . ." 46 U.S.C. § 2114(a)(1)(A) (emphasis added).  Thus, Defendant's first argument is that the evidence fails to show that Plaintiff was discharged.  In support of this argument, Defendant cites the following record evidence.

#### a.     Plaintiff's Deposition Testimony

Plaintiff testified at his deposition as follows:

| | |
|---|---|
| [Plaintiff]: | . . . [I] approached the chief engineer, and at that time he looked at me and he said that the company requests that you leave the vessel. |
| Q: | And what did you say at that point? |
| A: | I said okay, it's going to take me about 30 minutes to pack my belongings and I'll comply. |
| Q: | Were you given the option at that point of staying onboard? |
| A: | No.  I was requested to depart the vessel. |
| Q: | Did you ask if you were being fired? |
| A: | No. |
| Q: | Were you given any written termination notice? |
| A: | No. |
| Q: | Did you call the company to ask about employment status? |

A:          No. I was told to leave the vessel, which is equivalent to leaving the workplace. I had six days left to serve on my hitch. I was scheduled to get off the boat on vacation after my hitch in six days. It sounded like I was fired. That's what it sounded like to me.

Q:          So what did you do next?

A:          I went to my room and packed my gear and my seabag, my backpack.

(Plaintiff's Dep., Doc. 24, Ex. 2 at 22-23.) Plaintiff stated that after he packed, he went to the wheelhouse to get his discharge papers from the ship's captain.[1] Plaintiff testified that

> [t]he captain was in the wheelhouse. I asked him if he had my paperwork prepared. He said it was in the chartroom. I said fine, signed it, and he said so you don't feel safe here. And I said no, I was asked to depart the vessel. And I told the captain at that point in time, by the way, it was me who called the Coast Guard. And the captain said we kind of figured that.

(Pl.'s Dep. at 23-24.) Plaintiff stated that his understanding was that he had been fired. (*Id*. at 24.) The following day, Plaintiff called Defendant's personnel manager (Mr. Turman) and asked about his employment status. When Turman stated that Plaintiff had quit, Plaintiff responded, "I don't think so. I beg to differ." (*Id*. at 37.) Plaintiff immediately thereafter called a union representative to file a grievance and "to deal with it through the union." (*Id*.)

**b.     Peterson's Deposition**

Einar Peterson testified at follows at his deposition:

> . . . I called him over, and I said, I would like to talk to you. I said I notified the company about your concerns, I said, and they feel the same as I do, that if you are not satisfied or you don't feel safe, you are free to quit and leave the vessel before we sail. And he said, I'll talk to you later. He threw his hands up and went over to the other side of the vessel.

---

[1]At oral argument, the parties clarified that these "discharge papers," which are not in the record, do not shed any light on whether Plaintiff was fired or quit. The term "discharge" as used in this context simply means that Plaintiff was about to exit the ship, and when a person exits the ship these papers are prepared so that there is always an accurate record as to who is on board and so that each seaman's time on the vessel is documented.

A little while later, he come back, maybe five or ten minutes later, I was sitting on the hatch with the chief mate, and he stuck his finder in my face and he said, tell the fucking captain – or tell the captain to get my fucking discharge ready, I'm getting out of here, I'm getting off.

I turned to the chief mate, and I said, got your radio? He said, yeah. I said, tell the captain to get his discharge ready, and he did. In the meantime, Polek packed up and got ready to get off the vessel.

(Doc. 24, Ex. 3, Petersen Dep. at 41.)

### c.    Discussion

Defendant asserts that the evidence indicates that Plaintiff voluntarily quit his position and is now trying to re-characterize it as a discharge. (Doc. 24, Br. in Supp. at 8.) As support, Defendant points to the fact that Plaintiff admitted in his deposition that he was not given a written termination letter. (*Id*.) Defendant also contends that Plaintiff would not have called the personnel department and inquired as to his employment status if he believed that he had been fired. Defendant further points to the testimony of the personnel manager, who stated that a replacement crew member was not arranged for until after Plaintiff had left the vessel. (*Id*., citing Turman Dep. at 48.) Finally, Defendant points to Peterson's testimony that when Plaintiff was told he was free to quit the vessel, Plaintiff's response to was request that the Captain prepare his discharge. (*Id*.)

Plaintiff counters that there is ample evidence from which a trier of fact could reasonably conclude that Plaintiff was fired. (Doc. 28, Br. at 7-8.) Plaintiff's deposition testimony is that he was asked to leave the vessel six days prior to the end of his "hitch" by Chief Petersen, and that when he told Captain Brezinski he had been asked to leave the vessel, the Captain did not disagree with this statement or indicate that Plaintiff was not terminated. Furthermore, the personnel manager acknowledged in his deposition that when he had a phone conversation with Plaintiff the day after he left the vessel, Plaintiff denied that he had quit. Plaintiff contends that numerous

courts have concluded that a difference of opinion concerning whether the plaintiff quit or was discharged constitutes a genuine issue of material fact that precludes summary judgment in a whistleblower case.

I suggest that, in this case, a genuine dispute over a material issue of fact exists regarding whether Plaintiff quit or was terminated. Plaintiff states that he was told to leave the vessel. Plaintiff's supervisor, Chief Peterson, states that Plaintiff quit. There were apparently no witnesses to this conversation and neither party has pointed to any documentation that adds much weight to their position. Plaintiff points out that Defendant did not contest his unemployment benefits, and argues that this fact constitutes an acknowledgment – or at least powerful evidence – that he was discharged, since employees who voluntarily quit are not entitled to unemployment compensation. Defendant counters that there can be many reasons why a company would choose not to contest a former employee's unemployment claim, and that such a business decision cannot be considered as evidence that Plaintiff was discharged. The Court agrees that it is not a conclusive fact, but nevertheless a jury could find it as one more factor weighing in favor of Plaintiff's version of events. On a summary judgment motion, the Court is required to view all such facts and inferences in the light most favorable to the non-moving party, which in this case is Plaintiff. *Matsushita*, 475 U.S. at 587. When doing so, it is clear that there is a genuine dispute over a material fact that could be resolved by a jury in Plaintiff's favor. Accordingly, I suggest that summary judgment on the ground that Plaintiff cannot prove he was discharged is not appropriate.

## 2.     Causation

The Seaman's Protection Act prohibits adverse employment action taken against a seaman "*because* the seaman in good faith has reported or is about to report to the Coast Guard . . ." a safety violation. 46 U.S.C. § 2114 (emphasis added). Defendant next asserts that Plaintiff's claim

fails and that it is entitled to summary judgment because, even if Plaintiff was discharged, Plaintiff

cannot prove that Defendant had knowledge that it was Plaintiff who reported the leak to the Coast

Guard and therefore Plaintiff cannot prove causation.  (Doc. 24, Br. at 9.)  Defendant's argument

in this regard rests on several uncontested facts:  Plaintiff asked the Coast Guard to keep his

complaint confidential; Plaintiff never told anyone on the ship that he contacted the Coast Guard

until after he received his discharge papers from Captain Brezinski and he told the captain that he

had been the one to contact them; Plaintiff discussed the leak with several other crew members,

any one of whom could have reported it to the Coast Guard; and Defendant's key personnel

(Brezinski, Peterson, Wiltse, and Bouhall) all testified at their depositions that they did not know

it was Plaintiff who made the report to the Coast Guard until after Plaintiff informed the captain.

(*Id*. at 10-11.)

Plaintiff counters that he has come forward with ample evidence to show that Defendant

knew or at least strongly suspected that Plaintiff had been the one to report the hole in the vessel

to the Coast Guard.  (Doc. 28, Br. at 12.)

I suggest that, even if it is true that many other crew members were aware of the leak and

could have notified the Coast Guard, Plaintiff has come forward with ample evidence indicating

that the only crew member Petersen, Brezinski, and Wiltse suspected was Plaintiff.  The email

from Petersen on the morning in question demonstrates this:

> I also told [Plaintiff] that people getting on the phone and telling others ashore such
> nonsense, would potentially put the vessel's (as well at their own) future usefulness
> in jeopardy.  All it would take it for someone to "drop a dime" to the Coast Guard,
> and we would be tied up for an indefinite time while they investigated.
>
> *He is still not satisfied*, and insists that his safety out here is paramount.

(Doc. 28 at Ex. C, emphasis added.)  Petersen states in this email that he had warned Plaintiff that his "future usefulness [was] in jeopardy" if he continued to mention the leak.  Petersen also reveals that, in his opinion, Plaintiff was still not satisfied with the "it's not a problem" answer he had received.  The Court has no trouble concluding that a jury, after reading this email, could reasonably come to the conclusion that Plaintiff was asked to leave the vessel because Petersen believed that Plaintiff had reported or was about to report the leak to the Coast Guard. Accordingly, I suggest that Defendant is not entitled to summary judgment on this basis.

> 3.      **Good Faith Report**

The Seaman's Protection Act prohibits taking adverse employment action against a seaman who "in good faith has reported or is about to report to the Coast Guard or other appropriate Federal agency or department that the seaman believes that a violation of a maritime safety law or regulation prescribed under that law or regulation has occurred . . . ."  46 U.S.C. § 2114(a)(1)(A).  Defendant argues that it is entitled to summary judgment because Plaintiff's report to the Coast Guard was not a good faith report of a violation of a maritime safety law or regulation because the leak was merely "minor." (Doc. 24, Br. at 13.)  Defendant points out that after the leak was inspected by the Coast Guard, the vessel was permitted to depart Stoneport and the damage was not required to be repaired until the vessel arrived at a Lake Erie port.  (*Id*. at 13-14.) Defendant also cites the deposition testimony of Engineering Superintendent John Hayes, who stated that, in his "expert opinion," "the extent of the damage as found when it was permanently repaired at a Lake Erie port was such that it did not affect the seaworthiness of the vessel, and therefore would not have required a report of a hazardous condition to the Coast Guard." (*Id*. at 14.)

Plaintiff counters by first pointing out that the plain language of the statute requires only that the seaman have a good faith *belief* that a violation of maritime safety law or regulation has occurred. (Doc. 28, Br. at 15.) Plaintiff also cites *Gaffney*, where the court stated:

> The legislative history of § 2114 indicates that Congress intended that the statute provide protection to a plaintiff who honestly believed that there was a regulatory violation, but who turned out to be incorrect.

*Gaffney*, 451 F.3d at 449 n.25 (citing *Donovan v. Texaco, Inc.*, 720 F.2d 825 (5th Cir. 1983)).

Plaintiff further points to the deposition testimony of Captain Brezinski and First Mate Brouhall. When Captain Brezinski was asked about his conversation with the Coast Guard officers who boarded the vessel to inspect it after Plaintiff had departed, Captain Brezinski acknowledged that the officers told him he should have reported the crack in the hull himself:

> Q:    Did any of the [Coast Guard] officers ask you whether you had notified the Coast Guard yourself?
>
> A:    It was brought up in the conversation, yeah. And then – well, I assumed that the office would have contacted the people involved.
>
> Q:    And they told you that as the master, it is really your responsibility to notify them?
>
> A:    Yes.
>
> Q:    But you had erroneously thought that the office had already called the Coast Guard?
>
> A:    Yeah. Or ABS.

(Brezinski Dep., Doc. 28, Ex. D at 41.) When First Mate Brouhall was asked whether the leak was, in his opinion, a "reportable marine casualty," and he answered:

> Today at this time, yes, I was – I had, you know, the Coast Guard told us any time you see something like that, report it, so yes.

(Brouhall Dep., Doc. 28, Ex. G at 54.)

I suggest that the evidence clearly shows that Plaintiff honestly and in good faith believed that a safety violation was occurring. That fact is not only supported by the deposition testimony cited above, but also by the Peterson email where Chief Peterson states that Plaintiff "is still not satisfied, and insists that his safety out here is paramount." (Doc. 28 at Ex. C.) Whether the leak subsequently was categorized as severe enough to meet the technical definition of "hazardous condition" is irrelevant under *Gaffney*. Thus, because a factfinder could reasonably find in favor of the non-movant on this issue, I suggest that summary judgment is inappropriate.

### 4.      Punitive Damages

Defendant moves for summary judgment on Plaintiff's prayer for punitive damages. Defendant claims that punitive damages are not available under the Seaman's Protection Act because the Act omits any reference to them. (Doc. 24, Br. at 15.) Alternatively, Defendant states that when punitive damages are awarded under 46 U.S.C. § 2114, they are only appropriate when a defendant acted willfully and wantonly in discharging the plaintiff. (*Id.*, citing *Gaffney*.) Defendant asserts that the extensive discovery that has taken place in this case has uncovered no support for a claim of retaliatory discharge, "let alone support for a finding that defendant's actions were so utterly outrageous that it would merit an award of punitive damages." (*Id.* at 15-16.)

Plaintiff responds that Defendant conceded at an earlier hearing on a motion to compel discovery that punitive damages are recoverable in an action brought under 46 U.S.C. § 2114. (Doc. 28, Br. at 17.) Next, Plaintiff points to the fact that every court that has addressed the issue has held that punitive damages are available under § 2114 pursuant to the language of the statute providing that "the court may order *any appropriate relief*, including" a restraining order, reinstatement, back pay, costs, and attorney's fees. 46 U.S.C. § 2114(b) (emphasis added). In *Gaffney*, the Seventh Circuit reasoned that

in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S. Ct. 1028, 117
L. Ed. 2d 208 (1992), the Supreme Court held that, as a general matter and "absent
clear direction to the contrary by Congress, the federal courts have the power to
award *any appropriate relief* in a cognizable cause of action brought pursuant to a
federal statute," including compensatory and punitive damages. *Id*. at 70-71, 112
S. Ct. 1028 (emphasis added). In turn, when a statute explicitly makes available
"any appropriate relief," referencing the broad power of the federal courts to award
both compensatory and punitive damages, we can infer that Congress intended
prevailing plaintiffs to recover compensatory and punitive remedies. This is true of
§ 2114 . . . .

*Gaffney*, 451 F.3d at 459. I thus suggest that punitive damages are available in an action brought

under § 2114.

As to Defendant's assertion that, even if punitive damages are available in a Seaman's Act

case, it is entitled to summary judgment on this issue because there is no evidence in the record

from which a jury could find that Defendant acted willfully or wantonly, Plaintiff responds by

pointing to evidence discussed above, such as the Petersen email describing Plaintiff as a "weenie,"

the Wiltse email characterizing Plaintiff's safety concerns as the "nonsensical ravings of an

inexperienced junior engineer," and the timing of Plaintiff's exit from the ship – less than one hour

after the Coast Guard called Captain Brezinski to inform him that they had received word of a

crack in the hull and would be coming to inspect the vessel. (Doc. 28, Br. at 19-20.) Counsel for

Plaintiff argues that a reasonable jury could view these facts as evidence of a willful and wanton

retaliatory discharge. Viewing the evidence and inferences therefrom in the light most favorable

to Plaintiff, as the Court must at this juncture, I suggest that Plaintiff's counsel is correct and that

Defendant's motion for summary judgment on the prayer for punitive damages should be denied.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." FED. R. CIV. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

s/ Charles E. Binder

CHARLES E. BINDER

Dated: November 30, 2010                          United States Magistrate Judge

### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed on November 30, 2010, and electronically served on counsel of record and U.S. District Judge Ludington via the Court's ECF system.

Dated: November 30, 2010                    By  s/Mimi D. Bartkowiak

Law Clerk to Magistrate Judge Binder