UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JEFFREY POLEK,

    Plaintiff,   Case Number 09-13869
   Honorable Thomas L. Ludington
v.

GRAND RIVER NAVIGATION,

    Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL OR FOR REMITTITUR ON THE PUNITIVE DAMAGE AWARD, GRANTING PLAINTIFF'S MOTION TO AMEND BILL OF COSTS, AND CANCELING HEARING**

On September 30, 2009, Plaintiff Jeffrey Polek ("Plaintiff") filed a complaint alleging a violation of the Seaman's Protection Act, contending that his former employer, Grand River Navigation, Inc. ("Defendant"), discharged or otherwise discriminated against him because of his good faith report to the United States Coast Guard ("Coast Guard") of an alleged violation of a marine safety regulation. ECF No. 1. Following a three-day jury trial, the jury returned a verdict in favor of Plaintiff and awarding him $33,500 in compensatory damages, $1,000 in attorney fees, and $100,000 in punitive damages against Defendant. ECF No. 51.

**I**

On February 13, 2012, Plaintiff filed a motion to amend the bill of costs to provide supporting documentation explaining how the transcripts he purchased were used at trial in order to substantiate his request for reimbursement for court reporter fees. Plaintiff's request for copying fees has also been omitted because such costs are not taxable without a court order. Plaintiff's requests are reasonable, and his motion will be granted.

**II**

**A**

On February 23, 2012, Defendant Grand River Navigation filed a motion for new trial on the issue of punitive damages or, in the alternative, for remittitur of the amount of punitive damages. ECF No. 59. Defendant argues that the jury's award of punitive damages is against the manifest weight of the evidence and potentially driven by passion and sympathy, and in violation of the Constitution's Due Process Clause.

At trial, the jury was instructed that they may assess punitive damages if they found that Defendant's conduct was malicious, wonton, oppressive or in reckless disregard of Plaintiff's rights. The jury was also instructed that if they believed that punitive damages were appropriate, the amount of such damages should be limited to an amount to accomplish the purpose of punishing Defendant for its extraordinary misconduct and should not be levied because of bias or prejudice against Defendant.

Defendant contends that, during closing arguments, Plaintiff's counsel sought to inappropriately inflame the jury's passion for awarding punitive damages by comparing the instant case with the grounding and subsequent loss of life of the Italian cruise ship Costa Concordia and the BP offshore oil spill in the Gulf of Mexico. Plaintiff's counsel also sought to elicit testimony at trial that the vessel at issue in this case grounded, ran up on the rocks, and hit bridges in violation of the law. Defendant contends that there was no evidence presented that it violated any laws, that it unintentionally placed the vessel aground, or that it collided with any bridge without making the appropriate reports.

The underlying event that precipitated this case was Plaintiff's report of a fracture in the vessel's side shell. Defendant emphasizes that the fracture was small and above the waterline. During trial, a witness testified that the Coast Guard inspectors were initially unable to locate the fracture from inside the vessel's ballast tank because their flashlights were not powerful enough. Only after a higher intensity flashlight was provided were the inspectors able to actually see the fracture and assess the potential threat to the vessel's seaworthiness. Defendant also notes that, after assessing the damage, the vessel was permitted to sail the length of Lake Huron and transit to an offloading port in Lake Erie before the fracture was repaired. The Coast Guard did not issue Defendant a citation for failing to report the fracture when it was first identified, and there was also testimony at trial indicating that the fracture had been present for a long period of time because rust had begun to form over the damage on the outside of the vessel.

Defendant also argues that Plaintiff's counsel inappropriately urged the jury to award a large amount of punitive damages to prevent a catastrophe such as the Costa Concordia grounding or the BP oil spill. The Costa Concordia involved the grounding of a large passenger vessel on a rocky bottom which caused multiple compartments to flood before the vessel eventually capsized, resulting in the loss of more than a dozen passenger lives, an oil spill that reached a picturesque coastline, and possible criminal charges against the vessel's master for his reckless actions. Comparatively, the fractures found on the MANISTEE, the vessel at issue, were less than 4" in length, and there was no evidence presented that the damage affected the vessel's seaworthiness. The BP oil spill in the Gulf of Mexico was one of the largest oil spills in the world, and was apparently caused by a series of equipment failures, including backup systems, that were required by law and designed to prevent the blowout of the well. Defendant reiterates that there was no evidence presented that any laws

were broken, and no safety systems were found to be malfunctioning.

**B.**

To determine whether a punitive damage award violates due process, the court must evaluate (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm to the plaintiff and the punitive damage award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). In assessing the reprehensibility of a defendant's conduct where the harm is economic and not physical, the primary considerations to be addressed are whether the defendant's conduct evinced an indifference to or a reckless disregard of the health or safety of others, the plaintiff's financial vulnerability, whether the defendant's conduct was repeated or was an isolated incident, and whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.* at 419. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. *Id.* Because it is presumed that the plaintiff is made whole by compensatory damages, punitive damages should only be awarded if the defendant's conduct is so reprehensive that further sanctions are appropriate to achieve punishment or deterrence. *Id.*

Here, Defendant submits that the harm was economic and not physical and therefore, Plaintiff's financial vulnerability should be analyzed. There was testimony at trial that Plaintiff missed approximately 62 to 66 days of work after the incident that led to the complaint. For those days of lost work, the jury determined that Plaintiff's lost wages and benefits were $33,500. There was also testimony that Plaintiff was able to gain employment in the same industry shortly after the

incident, and that his wages were higher in the sailing season after this incident than before. And finally, the jury did not award any damages for emotional distress, mental anxiety, embarrassment, annoyance and damage to reputation. As a result, Defendant argues that a jury could not reasonably conclude that Plaintiff was financially vulnerable.

Addressing the next element, Defendant suggests that there was no evidence that its conduct evinced an indifference to or a reckless disregard of the health or safety of others. There was testimony that the damage discovered on the MANISTEE was inconsequential, that it was reasonable to have the damage repaired at a later date when there was better access to repair facilities, and that it did not affect the vessel's seaworthiness. There was also testimony that experienced personnel on board the vessel examined the damage and discussed the matter with shoreside engineering support staff. The only evidence presented that the damage was a threat to the vessel's safety came from Plaintiff's own testimony who was one of the most inexperienced members of the crew. Thus, Defendant contends that this evidence could not have lead the jury to believe that Defendant showed a reckless disregard for the safety of the vessel's crew or to the public at large.

Next, Defendant argues that there was no testimony or other evidence presented that Defendant's conduct was repeated. As to the final element of the reprehensibility analysis, Defendant concedes that the jury found that harm Plaintiff suffered was a result of Defendant's intentional conduct.

The final factor in the due process analysis is the disparity between the harm to the plaintiff

and the punitive damage award.[1] Defendant emphasizes that the jury's award of $100,000 in punitive damages is nearly three times the award of compensatory damages, and should be compared with *Gaffney v. Riverboat Services of Indiana, Inc.*, 451 F.3d 424 (7th Cir. 2006), which is the only other seaman's retaliatory discharge where an appeals court addressed the propriety and amount of punitive damages. In *Gaffney*, the plaintiffs had made a formal complaint to the Coast Guard about the amendment to the subject vessel's Certificate of Inspection, which resulted in the allowance of more junior engineers than was previously permitted. *Id.* at 432-33. After the Coast Guard reviewed the plaintiffs' complaint, it restored the previous requirement for shipboard engineers. *Id.* at 435. Within 3 weeks of that action, the defendant sent a written termination letter to one of the plaintiffs that based the termination on his unauthorized communication and correspondence with regulatory bodies having jurisdiction over the operation of the vessel. *Id.* at 436. The other plaintiffs were then provided with written termination letters, but no reasons for their termination were given. *Id.* The plaintiffs requested treble damages, but the lower court noted that their request for three times the compensatory damages was disproportionate to the type of harm suffered and would result in a windfall for the plaintiffs. *Id.* at 464. The appellate court concluded that the award of punitive damages of $25,000 for each plaintiff was appropriate where the actual damages for six of the eight plaintiffs was more than $25,000. 451 F.3d 424, 465 (7th Cir. 2006)

Defendant contends that the facts of *Gaffney* are instructive as to the unreasonableness of the punitive damage award based on the facts of this case. The plaintiffs in both matters were licensed shipboard engineers with claims against their former employers under the Seaman's Protection Act,

---

[1] The additional factor of the comparison between the award and the applicable civil penalty is irrelevant because there is no applicable civil penalty in this matter.

46 U.S.C. § 2114. The defendant in *Gaffney*, however, provided the first employee with a termination letter that provided the reason for termination as his correspondence with the Coast Guard. *Id.* at 463. After the first employee advised the defendant that his correspondence was protected by law, the defendant removed the offending language and provided written termination letters to the remaining plaintiffs without justification for the terminations. *Id.* at 463-64. In this case, there was no written termination letter or any equivalent evidence. Defendant emphasizes, by way of comparison, that it did not know that Plaintiff was not going to complete his voyage until after the conversation with his supervisor on the deck of the ship. Defendant also contends that the incident with Plaintiff was isolated to a single employee in contrast to the facts in *Gaffney*. The court in *Gaffney* nevertheless concluded that punitive damages in the amount of $25,000 for each plaintiff was an appropriate amount to serve the objective of deterrence and punishment. *Id.* at 464. In this case, with a set of facts more favorable to Defendant, Defendant argues that they jury's decision to award three times the compensatory damages awarded as punitive damages was excessive.

## C.

In response, Plaintiff first emphasizes that Defendant did not lodge an objection or seek any curative instruction from the Court during Plaintiff's closing argument. As a result, the degree of prejudice which Defendant must demonstrate in order to obtain a new trial is raised substantially. *Stickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998); *Kokesh v. American Steamship Co.*, 747 F.2d 1092, 1095 (6th Cir. 1984).

Moreover, Plaintiff also emphasizes that in *Portis v. Grand Trunk Western Railroad Co.*, 28 F.3d 1214, 1994 WL 362110 (6th Cir. 1994), the United States Court of Appeals addressed an argument similar to Defendant's that "improper and prejudicial comments designed to influence the

jury" led to a verdict based on passion, prejudice and sympathy. The Sixth Circuit rejected this argument, holding that

> [a] new trial may be granted if "improper closing argument irreparably prejudices a jury verdict." However, defendant did not object to these comments at any time before the jury retired to deliberate. After the jury returned the unfavorable verdict, defendant for the first time called the alleged improprieties to the court's attention. At that point it was too late for the court to cure any possible problems caused by plaintiff counsel's comments. "[I]n a civil action, '[a] principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result.'" Defendant has not shown that any gross injustice resulted from plaintiff counsel's statements in closing argument. Therefore, a new trial could not be granted on these grounds even if plaintiff counsel's statements were improper.

*Id.* at *3 (internal citations omitted). Here, Plaintiff contends that, just as in *Portis*, there was no "gross injustice" that resulted from his closing argument.

Plaintiff's counsel explains that he referenced the recent current events involving the Costa Concordia and the BP offshore oil spill only to demonstrate that in a maritime setting, when safety rules and regulations are ignored or equipment not properly inspected and maintained, the consequences can be disastrous. Plaintiff's counsel made this point clear to the jury and only suggested that it was preferable to have individuals such as Plaintiff who are vigilant and err on the side of caution rather than an individual that would conceal a hull fracture from the Coast Guard because the employer did not want to delay the ship for inspection.

Plaintiff's counsel also responds that he properly elicited testimony at trial that the M/V MANISTEE grounded, made contact with the lake/river bottom and brushed up against bridges. Plaintiff notes that no objection to this testimony was made during trial and, accordingly, any objection to this testimony has been waived. Moreover, Plaintiff explains that this testimony was relevant to the issue of Plaintiff's good faith belief that the hull fracture posed a safety hazard that

should have been reported to the Coast Guard. Plaintiff testified that the instances of the MANISTEE making contact with rocks and/or the lake bottom as well as making contact with the Blossom Street Bridge occurred within a day or two of the hull fracture being identified. This demonstrated Plaintiff's correlation between these incidents and the leak that was discovered in the starboard bow of the vessel. Plaintiff discussed these incidents with Chief Engineer Petersen who subsequently referenced them in his email that he sent to the company's corporate offices on September 10, 2009.

Plaintiff notes that, despite Defendant's attempt to downplay the severity of the hull fracture, there was evidence that the fracture was below the waterline when the vessel was in a loaded configuration and was the type of damage about which the Coast Guard expected to be notified. Both Captain Brezinski and first mate George Bouhall testified at trial that they were admonished by the Coast Guard for not reporting the hull fracture. While Plaintiff acknowledges that Defendant is correct in observing that it was not "cited" by the Coast Guard, Plaintiff notes that the Coast Guard still issued a Form CG 835 which is a directive to effectuate repairs in a specified period of time—here, immediately upon the vessel's return to Cleveland.

Plaintiff responds to Defendant's accusation that his reference to the Costa Concordia and the BP oil spill was illustrative of his concern that the hull fracture presented a safety hazard which potentially jeopardized not only his own personal safety, but that of his fellow shipmates. In addition, Plaintiff believed, based on his training and education, that such a hull fracture should be immediately reported to the Coast Guard so that the proper safety inspections could be performed. Defendant, principally through the testimony of Chief Engineer Einar Petersen, not only wished to defer making repairs, but Plaintiff believed Petersen also wanted to conceal the presence of the hull

fracture from the Coast Guard. In arguing for punitive damages, Plaintiff's counsel suggested that the jury award between $250,000.00 and $1,000,000.00 in punitive damages to punish Defendant for its cavalier attitude and repeated instances of covering up and failing to report safety hazards. Plaintiff demonstrated at trial that, in addition to its failure to report the hull fracture, Defendant also did not report the "visible sheen of oil" in the water which Plaintiff brought to the attention of another one of Defendant's engineers. Rather than report the oil discharge to the Coast Guard as Defendant was legally obligated to do, the Chief Engineer brought his index finger up to his pursed lips and told Plaintiff "shhh." Additionally, Captain Brezinski admitted that he had previously been on board the vessel when it allided with a bridge and did not report the allision to the Coast Guard. Instead, the bridge tender on duty at the time of the incident reported the allision.

Plaintiff's counsel believes that his reference to the Costa Concordia grounding and the BP oil spill was particularly relevant considering the potential for loss of life and threat to the environment if the hull fracture propagated and imperiled the M/V MANISTEE. It is undisputed that the subject hull fracture was in way of the No. 6 ballast tank, and every witness who testified in the case acknowledged that ballast tanks are important for vessel stability and maneuverability. The potential for catastrophe existed with respect to this 625' lake freighter carrying 17 people and 65,000 gallons of fuel. Considering the potential for disaster, Plaintiff's counsel contends that he was posing a rhetorical question for the jury to decide whether they would prefer crew members on Great Lakes freighters like Plaintiff, who err on the side of caution and report perceived safety hazards to the appropriate authorities, or, someone like Chief Engineer Petersen who instead chooses to conceal a hull fracture from the Coast Guard in order to avoid a delay and the consequent loss of money to the company.

Plaintiff also submits there was ample evidence that the fracture should have been reported to the Coast Guard. The reportability of the incident, however, is not the standard under a claim brought pursuant to the Seaman's Protection Act. All that is required is that Plaintiff have a good faith belief that a violation of a safety law or regulation occurred and that Defendant discharged or otherwise discriminated against him because of his report to the Coast Guard. Here, the jury concluded that Defendant unlawfully terminated Plaintiff's employment because of his good faith report of the hull fracture to the Coast Guard, and further found that Defendant's retaliatory conduct toward Plaintiff merited an award of punitive damages to punish Defendant for its wrongful conduct. Plaintiff emphasizes that during closing argument, he requested a punitive award between $250,000.00 and $1,000,000.00. The jury nevertheless returned a punitive award of $100,000.00, which Plaintiff contends offers evidence that the jury award was not the product of passion's inflamed by counsel during closing argument.

As Plaintiff notes, the court in *Campbell*, *supra*, explained that the degree of reprehensibility of the defendant's conduct is the most important factor in determining the constitutionality of the punitive award. *Id.* at 419. Plaintiff concedes that the harm caused by Defendant's unlawful actions was economic and not physical but emphasizes that Defendant's conduct demonstrated an indifference to, or reckless disregard for, the health and safety of Plaintiff, his fellow crew mates, and the public at large. Despite Plaintiff repeatedly expressing his concern not only for his own safety, but the safety of his fellow shipmates, Defendant disregarded his legitimate concerns. Plaintiff emphasizes that Defendant did not attempt to ascertain the nature and extent of the damage from the inside of the ballast tank, and continued to labor under the assumption that the damage was merely a leaking rivet, which later proved to be false when the vessel was repaired in Cleveland.

Moreover, despite being made aware of Plaintiff's concern for his own and his fellow crew mates' safety by virtue of Chief Petersen's email, none of Defendant's shoreside personnel, including Vice President Ed Wiltse and Personnel Manager Rick Turman, responded directly to Plaintiff or even explained the company's assessment of the situation. Instead, his concerns were labeled the "non-sensical ravings of a junior engineer" and he was encouraged to quit if he did not feel safe aboard the vessel.

Finally, the testimony at trial was that Defendant's intention was not to repair the hull fracture until winter lay up, some five months later but it was subsequently ordered to effectuate repairs immediately upon the vessel's arrival in Cleveland two days later. Plaintiff also finds it noteworthy that the ship repair personnel, after removing a section of plating from inside the ballast tank detected not one, but two fractures, roughly 2" x 4" in length in close proximity to one another. Plaintiff contends that this is a far cry from a leaky rivet or "little pisser" as Chief Petersen characterized the fracture.

Plaintiff argues that Defendant's conduct thus demonstrates an indifference to and reckless or callous disregard for Plaintiff's safety, the safety of his shipmates, and the safety of the public at large. Rather than report the hull fracture to the Coast Guard, Defendant demonstrated an intent to conceal the fracture, admonishing Plaintiff not to "drop a dime to the Coast Guard" lest his "future usefulness be placed in jeopardy." Plaintiff believes that the jury was understandably perturbed by Defendant's conduct.

Regarding the third factor, Plaintiff submits that he was indeed a financially vulnerable victim, having pursued a career change late in life which involved him expending substantial time and funds obtaining his Coast Guard license from the Great Lakes Maritime Academy. Defendant

-12-

was Plaintiff's first post-graduation employer. Plaintiff's employment was subsequently terminated in September 2009, at the depth of the economic recession. Plaintiff explained at trial that he feared he might not be able to secure replacement employment in the maritime industry because of the finite number of maritime employers and his concern that he may be "blackballed." Plaintiff was unable to find any employment for more than three months following his termination, and only then was he able to secure a job aboard a research vessel making substantially less money than he had been making with Defendant. Thereafter, Plaintiff was forced to take a job out of state in the Gulf of Mexico working in the oil fields. As a maritime employer operating on the Great Lakes, Defendant was aware of the paucity of well-paying jobs available for new officers in the fall of 2009 when it wrongfully terminated Plaintiff for his good faith report to the Coast Guard.

Plaintiff also contends that the evidence in this case demonstrates that Defendant's conduct in concealing hazards from the Coast Guard by admonishing its crewmembers to remain silent was indeed repeated. In addition to threatening Plaintiff's job should he "drop a dime" to the Coast Guard concerning the hull fracture, Plaintiff also testified that he was similarly instructed to keep quiet by another one of Defendant's chief engineers when he reported an earlier oil discharge. Defendant's own witnesses, including Personnel Director Rick Turman and Captain Ronald Brezinski, testified at trial that federal law requires that the Coast Guard to be notified whenever there is a visible sheen of oil on the water. Nevertheless, Defendant's Chief Engineer instructed Plaintiff to remain quiet when he brought the oil spill to his attention. Finally, Captain Brezinski admitted that he previously made contact with a bridge and failed to report the allision to the Coast Guard notwithstanding the fact that bridge strikes are reportable events. Plaintiff argues that the fact that Defendant's motivation for concealing things from the Coast Guard was to preserve company

profits at the expense of safety makes Defendant's conduct all the more reprehensible.

The Supreme Court's second guidepost directs the Court to consider the ratio of actual harm suffered by the plaintiff to the punitive damage award. The Supreme Court has declined to create a bright line rule regarding the permissible ratio, but has stated that awards exceeding a single-digit ratio may be subject to constitutional challenge. *Campbell*, 538 U.S. at 425, 429 (reversing and remanding a punitive damage award of $145,000,000.00 when the compensatory damages were only $1,000,000); *see also Campbell v. State Farm Mutual Auto Ins. Co.*, 98 P.3d 409, 418 (Utah 2004), cert. denied, 543 U.S. 874 (2004) (noting that after the punitive damages award was reduced to just over $9,000,000.00 on remand in *Campbell*, 538 U.S. 408, State Farm again petitioned for certiorari, which the Supreme Court denied).

Here, Plaintiff's compensatory damages, including the $1,000.00 statutory attorney fee, total $34,500.00. The ratio of compensatory to punitive damages is thus 2.89:1 and within the constitutional limits prescribed by the Supreme Court and the Sixth Circuit. *See e.g.*, *Romanski v. Detroit Entertainment, LLC*, 428 F.3d 629 (6th Cir. 2006) ($279.05 in compensatory damages and $600,000.00 punitive award yielding a 2,150:1 ratio); *Tisdale v. Federal Express Corp.*, 415 F.3d 516 (6th Cir. 2005) ($100,000.00 punitive damages award in Title 7 wrongful termination suit found constitutional where it was nearly seven times the award for back pay); *Cambio Health Solutions, LLC v. Reardon*, 234 F. App'x 331 (6th Cir. 2007) (5.65:1 ratio).

Plaintiff distinguishes *Gaffney* by first noting that it was a Seaman's Protection Act suit that proceeded to a bench trial as opposed to a jury trial. The eight plaintiffs were awarded punitive damages in the amount of $25,000.00 each. One of the plaintiff's compensatory damages were only $100.00 resulting in a 250:1 punitive damages ratio and lead plaintiff Gaffney's compensatory

damages were $10,632.00 yielding a 2.35:1 punitive damages ratio. *Gaffney*, 451 F.3d at 440 n.16. The Seventh Circuit upheld the punitive awards, observing the lower court's need to "vindicate [the plaintiffs'] rights," "serve the objective of deterrence and punishment," "punish the defendants' willful and wanton conduct and to deter others from engaging in similar illegal conduct." *Id.* at 464. The Seventh Circuit noted that "[t]his goal is particularly significant in the context of a retaliatory discharge claim, as here, given that the outcome of the case "may have a chilling effect on the willingness of other seamen to report a violation." *Id.* at 464-65

Plaintiff also emphasizes that there are marked differences between this case and *Gaffney* which support the jury's punitive award. First, Plaintiff argues that Defendant's conduct in this case was more malicious than that of the conduct of the defendant in *Gaffney*. In *Gaffney*, the alleged regulatory violation involved the defendant's employment of limited licensed engineers on the vessel which originally had been condoned by the Coast Guard, whereas here, the alleged violation was a failure to report a safety hazard that affected the seaworthiness of the vessel. Moreover, the swiftness of the retaliatory action taken by Defendant—a mere 24 minutes after being informed that the Coast Guard was coming aboard to inspect—reflects much more animus than the three week period of time that elapsed between when the Coast Guard accepted the *Gaffney* plaintiffs' complaint and their subsequent termination. Furthermore, the evidence adduced at trial by Plaintiff was that Defendant's conduct in concealing facts from the Coast Guard was not isolated. Finally, the jury in this case was also presented with testimony and evidence showing that, in response to his legitimate and bonafide safety concerns, Defendant labeled Plaintiff a "potential liability to the company," characterized his concerns as the "non-sensical ravings of a junior engineer," and for good measure, branded him a "weenie." Thus, a disinterested trier-of-fact could easily conclude that

the conduct of Grand River Navigation was more reprehensible than that of the defendants involved in *Gaffney*, meriting a punitive damages award of $100,000.00.

**D.**

Here, as in *Gaffney*, the jury's punitive damage award does address the need to "vindicate [Plaintiff's] rights," and "serve the objective of deterrence and punishment." The need to deter others from engaging in similar conduct is "particularly significant" in the context of a retaliatory discharge claim involving public safety where, as here, an adverse outcome of the case "may have a chilling effect on the willingness of other seamen to report a violation." *Id.* at 464-65. While the ratio of punitive harm to actual harm is close to 3:1, it is still within the bounds that satisfy the due process standard outlined in the case law advanced by Defendant. Although Plaintiff was fortunate to secure new employment within three months, that does not negate the fact that Plaintiff faced locating a job with a termination on his record as a new maritime engineer during a recession. Plaintiff could reasonably be found to be financially vulnerable. Moreover, Plaintiff testified that the event leading to his termination was not an isolated incident. And, Defendant's conversations with Plaintiff as well as the internal emails referring to him could reasonably have been understood by the jury to be malicious.

Finally, the jury could reasonably have concluded that Defendant's conduct met the requisite degree of reprehensibility evidenced by the course of events leading to Plaintiff's departure for reporting the damage to the hull to the Coast Guard. While the management of commercial ships requires a certain quality of quasi-military management—it may be best to have a single competent captain in the event of an emergency—the jury could reasonably have concluded that this incident was not such a circumstance. Indeed, they furnished a note with their verdict that provided as

follows:

> On [b]ehalf of the jury we wish to extend one additional comment to Grand River Navigation Co., Inc. After extensive discussion regarding the content of the case we collectively recommend that the company invest the resources necessary to improve the management skills of their organization's structure.

Clearly, the jury concluded that Chief Peterson's unwillingness to address Plaintiff's life safety concern was unreasonable and, under the circumstances, reprehensible.

### III

Accordingly, it is **ORDERED** that Plaintiff's motion to amend the bill of costs (ECF No. 57) is **GRANTED**.

It is further **ORDERED** that Defendant's motion for new trial or remittitur on the punitive damages award (ECF No. 59) is **DENIED**.

It is further **ORDERED** that the hearing scheduled for April 10, 2012 is **CANCELED** because oral argument will not aid in the disposition of the motions. E.D. Mich. L.R. 7.1(f)(2).

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 25, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 25, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS